

**SIGNED this 01 day of December, 2009.**

_____
**R. Thomas Stinnett**
**UNITED STATES BANKRUPTCY JUDGE**
_____


UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF TENNESSEE
SOUTHERN DIVISION

In re:                                                                  Case No. 09-12487
                                                                        Chapter 7

U. S. INSURANCE GROUP, LLC

       Debtor


RICHARD P. JAHN, JR., Trustee

       Plaintiff

v.                                                                      Adv. Proc. No. 09-1079


CORNERSTONE COMMUNITY BANK,
COHUTTA BANKING COMPANY, and
BANK DIRECT FINANCE COMPANY,

       Defendants.

Appearances:

       Thomas E. Ray, Samples, Jennings, Ray & Clem, Chattanooga, Tennessee, for
           Richard P. Jahn, Jr., Trustee

       Scott N. Brown, Jr., Spears, Moore, Rebman & Williams, Chattanooga, Tennessee, for
           Cornerstone Community Bank

Laura F. Ketchum, Husch, Blackwell, Sanders, LLP, Chattanooga, Tennessee, for Cohutta Banking Company,

R. Thomas Stinnett, United States Bankruptcy Judge

## **MEMORANDUM**

USIG – an insurance agency – filed bankruptcy under chapter 11 and began administering the case as debtor in possession. USIG's main asset was its book of business. An insurance agency's book of business is essentially all its customer information, including accounting records as to commissions earned from sales of insurance policies or renewals of coverage. *Texas Truck Ins. Agency v. Cure (In re Dunham)*, 110 F.3d 286, note 1 (5th Cir. 1997); *Ohio Casualty Group v. Professional Ins. Management (In re Professional Ins. Management)*, 130 F.3d 1122, note 7 (3d Cir. 1997). The customer information provides a basis for the agency's continued business.

USIG filed this lawsuit against Cornerstone Community Bank and Cohutta Banking Company to determine the validity, priority, and extent of their security interests in the book of business. USIG also filed a motion for partial summary judgment. Before the court decided the motion, the court granted USIG's motion to sell the book of business with the claims of Cornerstone and Cohutta to attach to the proceeds. Shortly after the sale, the court granted USIG's motion to convert the bankruptcy case to a chapter 7 liquidation. Richard P. Jahn, Jr., was appointed bankruptcy trustee and took the place of USIG as the plaintiff. This memorandum deals with the trustee's motion for partial summary judgment.

The trustee's argument in the complaint and the motion for partial summary judgment can be summarized as follows:

> Under Article 9 of the Uniform Commercial Code (the UCC), USIG's book of business was a general intangible;
>
> Cornerstone filed a financing statement that failed to perfect a security interest in the book of business because the financing statement identified the collateral as USIG's accounts and related records but not the book of business or general intangibles;

Cohutta subsequently perfected a security interest in USIG's book of business by taking a security interest in general intangibles and filing a financing statement that listed general intangibles;

Cohutta's security interest in the book of business was perfected more than one year before USIG's bankruptcy;

Cohutta's security interest cannot be avoided by the bankruptcy trustee and has priority over any security interest Cornerstone might have had in the book of business because Cornerstone's security interest was not perfected;

The proceeds from the sale of the book of business should be promptly distributed to Cohutta to avoid additional costs to the bankruptcy estate.

The complaint's allegations and claims as to Bank Direct Capital Finance Company are not relevant to the trustee's motion for partial summary judgment.

The court can grant summary judgment only if there is no genuine issue of material fact and based on the undisputed facts the law entitles the moving party to judgment in its favor. Fed. R. Bankr. P. 7056; Fed. R. Civ. P. 56(c); *First American Title Ins. Co. v. Nation (In re Nation)*, 352 B.R. 656 (Bankr. E. D. Tenn. 2006).

Most of the material facts can be found in documents that are not subject to any dispute as to contents, time of execution, or time of filing. Cornerstone has filed the affidavit of Thomas Hicks Armor to oppose the trustee's motion for summary judgment, but the trustee has not challenged Mr. Armor's expertise or the accuracy of his conclusions. The court is concerned with the legal effect of undisputed facts. The facts are as follows.

USIG and Cornerstone Community Bank executed the security agreement in June 2003. The agreement provided:

> The word "collateral" . . . means the following described property, whether now owned or hereafter acquired, whether now existing or hereafter arising, and wherever located . . .
>
> All commissions on insurance premium accounts as listed in the attached exhibit "A"
>
> In addition, the word "collateral" also includes all of the following whether now owned or hereafter acquired, whether now existing or hereafter arising, and wherever located

. . .

(C) All accounts, general intangibles, instruments, rents, monies, payments, and all other rights arising out of a sale, lease, or other disposition of any of the property described in this Collateral section,

. . .

(E) All records and debts relating to any of the property described in this Collateral section [in any form], together with [USIG's] . . . interest in . . . all computer software required to [maintain or make use of] any such records or data on electronic media.

As to the debt secured by the agreement, it provided:

The word "indebtedness" means the indebtedness evidenced by the Note or Related Documents, including all principal and interest together with all other indebtedness and costs and expenses for which [debtor] is responsible under the Agreement or under any of the Related Documents.

The word "Note" means the Note executed by U. S. Insurance Group, LLC in the principal amount of $1,000,000 dated June 19, 2003, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of, and substitutions for the note or credit agreement.

The security agreement stated the maturity date of the loan (20003654) as June 19, 2004. It was signed by Russell H. Huston as president of USIG.

To perfect its security interest, Cornerstone filed a financing statement on June 23, 2003. It described the collateral as "all commissions on insurance premium accounts as listed in the attached Exhibit 'A'". Exhibit A listed the accounts of particular customers of USIG.

This same description of collateral was used in amended financing statements filed in June 2004 and August 2005. Each amended financing statement included a new Exhibit A signed by Russell H. Huston as president of USIG. In the 2004 financing statement, Cornerstone checked the box identifying it as an amendment restating the collateral description.

The amended financing statement filed in August 2005 noted an increase in the secured debt from $1,000,000 to $3,000,000. Cornerstone checked the box indicating that the amended financing statement added collateral. Exhibit A to the 2005 financing statement is obviously longer than Exhibit A

to the 2003 and 2004 financing statements.

In August 2006 Cornerstone filed the amended financing statement that is the key factual basis for the dispute raised by the complaint. The 2006 financing statement referred to the original financing statement filed in 2003. It identified the secured debt as loans 20009009 and 20010593 and noted an increase in the principal debt from $3,000,000 to $4,400,000. Finally, the 2006 financing statement described the collateral as:

> All Accounts, whether any of the foregoing is owned now or acquired later; all accessions, additions, replacements, and substitutions relating to any of the foregoing; all records of any kind relating to any of the foregoing.

Cornerstone did not check the box in the financing statement indicating that it added collateral. Cornerstone checked the box indicating that the financing statement gave a "restated collateral description."

In January 2008 Cornerstone filed a continuation statement that referred to the initial financing statement filed in June 2003. The continuation statement identified the debt as loan number 20009009.

In January 2008 USIG and Cohutta executed a security agreement giving Cohutta a security interest in USIG's general intangibles and other property. Cohutta filed a financing statement in February 2008 that indicated a security interest in general intangibles and other property.

In July 2008 USIG and Cornerstone executed another security agreement. It described the collateral as "All Accounts." It included the same provision as the earlier security agreement making all related data, records, and required software part of the collateral. It referred to loan number 20009009.

In May 2009 the court approved a sale of USIG's assets. Sold assets included customer lists, records, and files, including all rights, revenues and benefits arising from relationships and transactions with USIG's customers after the effective time of the sale. The sold assets also included the rights to renewals and expirations of the customers. Unsold assets included accounts receivable and sales contract receivables related to transactions prior to the effective time of the sale.

Cornerstone filed a response to the trustee's motion for partial summary judgment. It is supported by the affidavit of Thomas Hicks Armor, a local insurance agent with more than 30 years of experience in the business. He compared the customer accounts listed in Exhibit A to Cornerstone's 2005 financing statement to the assets sold in the bankruptcy sale. He concluded that Exhibit A to the 2005 financing statement listed all of the accounts and related records that were sold.

Mr. Armor pointed out that for each customer listed in Exhibit A, it included the policy number, the kind of policy, the expiration date, the annualized premium, and the annualized commission. Mr. Armor stated that USIG did not need a list such as Exhibit A to conduct its business, because the same information would have been in its printed or electronic files, but the value of an insurance agency is based on customer information such as this. Finally, Mr. Armor explained that in the agency business, the word "account" refers to both accounts receivable and customer accounts.

## DISCUSSION

The trustee has raised the question of whether Cornerstone or Cohutta had the superior security interest in USIG's book of business. Nevertheless, the court must discuss the effect of the Cornerstone's security interest in accounts. That security interest determines the existence and extent of Cornerstone's a security interest the records related to the accounts, and Cornerstone argues that those records make up the book of business.

The court has no doubt that Mr. Armor is correct as to the double meaning of "account" in the business of an insurance agency. An agency's valuable accounts receivable are for commissions due from insurance companies. But, the commissions due from the insurance companies are based on sales to and renewals by the agency's customers. A particular customer's account represents a commission account. The court is concerned, however, with the effect of Cornerstone's security agreement and the filed financing statements under Article 9 of the Uniform Commercial Code (the UCC). And Article 9 defines "account" for its purposes.

The definition of "account" includes "a right to payment of a monetary obligation, whether or not earned by performance . . . (iii) for a policy of insurance issued or to be issued . . . ." Tenn. Code

Ann. § 47-9-102(a)(2). An insurance agency and an insurance company will have an agency agreement that provides for the agency to earn a commission from the insurance company for policies sold. To the extent the agency has earned such a commission but has not received full payment, the agency's right to the unpaid commission comes within Article 9's definition of account. *Commercial National Bank. v. Seubert & Assoc., Inc.*, 807 A.2d 297 (Pa. Super. Ct. 2002).

Suppose the insurance agency has been paid the full commission earned from a sale or a renewal of coverage. Is there still a commission account based on the policy and the agency agreement? The agency contract will usually give the agency the right to a renewal commission if and when the customer renews coverage. The right to a renewal commission is a right to payment of a monetary obligation not yet earned by performance for a policy of insurance to be issued. In other words, the right to a renewal commission before a renewal is still an account under Article 9. *Stephenson v. First Union National Bank (In re Berry)*, 189 B.R. 82 (Bankr. D. S. C. 1995); *Smoker v. Hill & Assoc., Inc.*, 204 B.R. 966 (N. D. Ind. 1997); *see also Delacy Investments, Inc. v. Thurman*, 693 N.W.2d 479 (Minn. Ct. App. 2005) (real estate agent's commissions); *M. D. Hodges Enter. v. First Georgia Bank*, 256 S.E.2d 350 (Ga. 1979).

This result is obvious from amendments to Article 9. Article 9 previously defined contract rights as a category of collateral. Contract rights included an unearned right to payment based on an existing contract. The definition of "contract right" was deleted and the unearned right to payment under an existing contract was included in the definition of "account." Tenn. Code Ann. § 47-9-106 (1985); Tenn. Code Ann. § 47-9-106 (1986); *In re Liles & Raymond*, 24 B.R. 627 (Bankr. M. D. Tenn. 1982). The definition of account was amended again to cover amounts due from other kinds of contracts or transactions, including the reference to an insurance policy. Tenn. Code Ann. § 47-9-102(a)(2) (2000); Tenn. Code Ann.  § 47-9-106 (1999).

The right to a commission is not excluded from the definition of account by another provision of Article 9. Article 9 generally does not apply to a transfer of an interest in or an assignment of a claim under an insurance policy. Tenn. Code Ann. § 47-9-109(d)(8). USIG's right to a commission was

not an interest in or a claim under the insurance policy. It was a right arising under USIG's agency agreements with the insurance companies and it was based on USIG's sales or renewals. *Commercial Nat. Bank. v. Seubert & Assoc., Inc.*, 807 A.2d 297 (Pa. Super. Ct. 2002).

The financing statement filed by Cornerstone in August 2006 covered all of USIG's accounts. The court takes this to mean every account within Article 9's definition, but the court is concerned only with all commission accounts. USIG could have had customer accounts for which it never had and never would have the right to a commission. Those customer accounts would not have created commission accounts. If any such customer accounts were included in the bankruptcy sale, the parties have not mentioned it. The court can assume there were no such accounts or they were not sold in the bankruptcy sale.

The parties also have not discussed whether any of USIG's customers were paying their premiums through USIG. If so, USIG's right to payment of the premiums may have been an Article 9 account for the full amount of the premiums instead of the commissions still due on the accounts. This possibility makes no difference to the questions the court must answer to decide the motion for partial summary judgment.

This brings the court to the key part of Cornerstone's 2006 financing statement. It applied to "all records of any kind relating to" all commission accounts. The court has already explained that commission accounts under Article 9 included customer accounts for which USIG was still owed a commission earned earlier and customer accounts for which USIG would be entitled to a renewal commission if the customer renewed. Thus, all records related to commission accounts should include records related to every customer with a policy that had generated a commission or might generate a renewal commission. Mr. Armor's affidavit supports the reasoning that the customer accounts are the basis for an insurance agency's "accounts" under Article 9 -- for its commissions already earned and to be earned by renewals.

The records related to the commission accounts would include USIG's accounting records for earned and unearned commissions as to every policy that had already generated or might generate

a commission.

The trustee argues that all records related to commission accounts would not include most of USIG's book of business. That result is clearly incorrect in light of the court's reasoning. Thus, Cornerstone's financing statement appears to cover all of USIG's book of business or at least the valuable part of it.

The trustee seems to be arguing that Cornerstone's financing statement could give legally effective notice of a security interest in the book of business only by describing the collateral as the book of business or general intangibles. The court disagrees.

Section 9-504 of the UCC deals with adequacy of a description of collateral in a financing statement. Section 9-504(1) refers to § 9-108, which provides:

> (a) Sufficiency of description. Except as otherwise provided in subsections (c), (d), (e) and (f), a description of personal or real property is sufficient, whether or not it is specific, if it reasonably identifies what is described.
>
> (b) Examples of reasonable identification. Except as otherwise provided in subsection (d), a description of collateral reasonably identifies the collateral if it identifies the collateral by:
>
> (1) specific listing;
> (2) category;
> (3) except as otherwise provided in subsection (e), a type of collateral defined in the Uniform Commercial Code;
> (4) quantity;
> (5) computational or allocational formula or procedure; or
> (6) except as otherwise provided in subsection (c), any other method, if the identity of the collateral is objectively determinable.

Tenn. Code Ann. §§ 47-9-504(1) & 47-9-108.

Subsections (a) and (b) of § 9-108 refer to several exceptions from their rules, but none of the exceptions is relevant to the transactions between USIG and Cornerstone. The question is whether the description in the financing statement could have perfected a security interest in USIG's book of business according to the general rules in § 9-109(a) and (b).

The description of the collateral as all accounts reasonably identified every customer account for which USIG was entitled to an earned commission or a renewal commission. It was sufficient

to perfect a security interest in those commission accounts. The description went on to identify a particular kind of general intangible – all records related to those commission accounts. Tenn. Code Ann. § 47-9-108(b)(2), (3) & § 47-9-102(a)(2); *Commercial Nat. Bank. v. Seubert & Assoc., Inc.*, 807 A.2d 297 (Pa. Super. Ct. 2002). The description reasonably identified the records themselves and was sufficient to perfect a security interest. Reasonable identification does not depend on identifying either kind of collateral or the combination of various kinds of collateral as the book of business or a general intangible. Tenn. Code Ann. § 47-9-108; *Hunter v. Key Bank (In re Wisniewski)*, 265 B.R. 897 (Bankr. N. D. Ohio 2001); *Smoker v. Hill & Assoc., Inc.*, 204 B.R. 966 (N. D. Ind. 1997).

Furthermore, subsequent parties who understood the concept of the book of business would have been put on notice by the financing statement; they would have understood the description of collateral as applying to the valuable part of USIG's book of business. For a person with an incomplete understanding of the book of business, the financing statement still should have spurred an inquiry to determine whether or to what extent Cornerstone had a security interest in the book of business.

In summary, the description of collateral in Cornerstone's financing statement was sufficient to perfect a security interest in USIG's book of business. The pleadings, however, raise a more complicated question with regard to Cornerstone's security interest in all commission accounts and related records. The 2003 security agreement described the collateral as premium commission accounts listed in Exhibit A, which listed customer accounts. The security agreement defined collateral to include USIG's records related to the accounts listed in Exhibit A.

The 2003 security agreement created a security interest in "[a]ll accounts, general intangibles, instruments, rents, monies, payments, and all other rights arising out of a sale, lease, or other disposition of any of the property described in this Collateral section." The descriptive phrase beginning with "arising out of" makes this provision refer to other collateral described in the security agreement. As a result, this provision did not automatically extend the security interest to commission accounts other than those listed in Exhibit A; it did not create a security interest in all commission accounts.

Each of the financing statements filed in 2003, 2004, and 2005 was accompanied by an

Exhibit A listing accounts of particular customers. None of these financing statements listed related records as collateral.

The 2006 financing statement was the first to apply to all accounts and all related records. Including all related records in the description did not necessarily add collateral. The 2003 security agreement applied to records related to the commission accounts in which Cornerstone had a security interest. The question is whether the financing statement's description of the collateral as all accounts added collateral, accounts not previously covered by Cornerstone's security agreement.

All commission accounts would include not only existing accounts that were previously listed or could be listed but also accounts subsequently created by sales to new customers. Neither the 2003 security agreement nor the prior financing statements expressly attempted to include all commission accounts, including commission accounts created in the future. Thus, the 2006 financing statement apparently added collateral, commission accounts created in the future and any commission accounts not described in Exhibit A to the 2005 financing statement.

A security interest in these added commission accounts could have been perfected when the 2006 financing statement was filed only if Cornerstone earlier or at the same time acquired a security interest in the added commission accounts. Generally the creation of a security interest requires a security agreement that identifies the personal property as collateral. Tenn. Code Ann. §§ 47-9-203(a), (b). Nevertheless, the 2004 and 2005 financing statements were effective to add collateral because the president of USIG signed each new Exhibit A. That is, a person for USIG with authority to add new collateral executed an authenticated record authorizing the financing statement to add the collateral. Tenn. Code Ann. §§ 47-9-509(a), 47-9-315, 47-9-102(a)(7), & 47-9-102(a)(69). USIG's authorization to add the collateral to the financing statement amounted to an amendment of the security agreement to include the added collateral. The undisputed facts do not reveal any new or amended security agreement or an authenticated record for any more added commission accounts until July 2008 when USIG executed the security agreement giving Cornerstone a security interest in all commission accounts. Thus, Cornerstone apparently did not have a perfected security in more added commission accounts and the related records

until July 2008. Tenn. Code Ann. §§ 47-9-308(a), 47-9-309, 47-9-310; *Rentenbach Constructors, Inc. v. CM Partnership*, 639 S.E.2d 16 (N. C. Ct. App. 2007). That was after Cohutta perfected its security interest in all the records.

If perfection in the added commission accounts was delayed until July 2008, that would make no difference to the trustee. Cornerstone's security interest in all commission accounts and related records was still perfected more than 90 days before USIG's bankruptcy. The complaint does not allege that perfection in July 2008 would allow the trustee to avoid creation of the security interest in the added accounts and related records as a preferential transfer to an insider. 11 U.S.C. § 547(b)(4), (e)(1)(B), (e)(3) & § 101(31).

On the other hand, Cohutta's security interest could have priority as to some of USIG's records. Tenn. Code Ann. §§ 47-9-310 & 47-9-322. The court and the parties would be faced with the problem of dividing the records between Cohutta and Cornerstone and determining the value of each one's part.

Mr. Armor's affidavit solves this problem. He compared the accounts listed in Exhibit A to the 2005 financing statement with the accounts sold in the bankruptcy sale. He concluded that all the accounts sold in the bankruptcy case were the same accounts listed in Exhibit A to the 2005 financing statement. The trustee has argued that the 2006 financing statement rendered the 2005 financing statement ineffective because the 2006 statement restated the collateral description. The trustee's argument may treat "restated" as meaning the opposite of what it should mean. The court need not be concerned with whether the 2005 financing statement continued to perfect the security interest in the listed accounts after filing of the 2006 financing statement. The correct result is the same but justified by different reasoning.

Since the 2006 financing statement covered all commission accounts, it necessarily included the commission accounts listed in Exhibit A to the 2005 financing statement. According to Mr. Armor's affidavit, those accounts existed from 2005 up through USIG's bankruptcy filing. The 2006 financing statement instantly perfected the security interest in the related records since that security

interest already existed under the 2003 security agreement. The commission accounts covered by the 2005 financing statement and the related records were not collateral that the 2006 financing statement attempted to add without USIG's agreement. The court can assume the 2006 financing statement was ineffective as to *added* accounts and related records until execution of the 2008 security agreement. That is not a ground for holding the 2006 financing statement was ineffective with regard to collateral that was not added, specifically the commission accounts listed by the 2005 financing statement and the related records. These were the same commission accounts and related records sold in the bankruptcy case. Thus, the 2006 financing statement continued perfection in those commission accounts and related records from the time it was filed in 2006 through the filing of USIG's bankruptcy case that resulted in their sale.

In 2006 Cornerstone perfected its security interest in all of USIG's commission accounts and related records that were sold in the bankruptcy case. This perfection occurred before Cohutta perfected its security interest in USIG's records as general intangibles. This means that Cornerstone had the superior security interest in records that were sold as USIG's book of business, and it has the superior right to the proceeds of the sale. In this situation, the court should grant summary judgment to Cornerstone even though it has not filed a motion. This proceeding is appropriate for that course of action. *K. E. Resources, Ltd. v. BMO Financial Inc. (In re Century Offshore Mgt. Corp.)*, 119 F.3d 409 (6th Cir. 1997). The court will enter an order.

# # #